IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:21cr328-MHT |
| | ) | (WO) |
| JONATHAN DALE KNOTT | ) | |

OPINION AND ORDER

Defendant Jonathan Dale Knott pleaded guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  This cause is now before the court on Knott's motion for a downward variance.  For the reasons that follow, the motion will be granted and, in lieu of 27 months of incarceration, Knott will be sentenced to 27 months of home detention as one of the conditions of seven years of supervised release.

I.

Knott is a 30-year-old man with Asperger's Syndrome, also known as Autism Spectrum Disorder (ASD) without accompanying intellectual or language impairment.  (The court elaborates on the implications of this diagnosis

below.)  He lives at home with his parents and does not
work.

In April 2019, officers from the Alabama Law
Enforcement Agency's State Bureau of Investigation
downloaded a torrent file containing child pornography
from a then-unknown source using an online peer-to-peer
file-sharing program.  Through records obtained by
subpoena, they linked the Internet Protocol address of
the computer to Knott's address.  They then obtained and
executed a search warrant for his residence, recovering
one laptop and three hard drives that, together,
contained between 4,500 and 6,000 images of child
pornography and approximately 2,000 videos of child
pornography.

The government charged Knott in a felony information
with one count of possession of child pornography in
violation of 18 U.S.C. § 2252A(a)(5)(B).  He entered into
a plea agreement under which the government agreed to
seek a sentence at the bottom of the Guidelines range.
He also moved for a variance under the sentencing

framework laid out in *United States v. Klear*, 3 F. Supp. 3d 1298 (M.D. Ala. 2014) (Thompson, J.), and on the basis that his ASD puts his case outside the norm.

In June 2022, the court held a hearing on Knott's competency and motion for a variance, after which it found him competent to enter a plea. *See United States v. Knott*, 2022 WL 2079868 (M.D. Ala. June 9, 2022) (Thompson, J.), as amended by *United States v. Knott*, 2022 WL 2197012 (M.D. Ala. June 15, 2022) (Thompson, J.).

Evidence adduced at the hearing, which the court found credible, revealed that Knott first downloaded the child pornography found on his devices in late December 2017 and early February 2018. All of the child pornography that he downloaded was contained in four torrent files, which were advertised as four parts of a single pornography collection. These files also contained tens of thousands of computer-generated and cartoon pornography images--a type of pornography that he frequently viewed--featuring child-like characters.

At some point after downloading these files, Knott forgot about them.  Approximately a year later, while organizing his hard drives, he discovered them again but could not remember what they contained.  He tried to open them but found that they had become corrupted and could not be viewed.  Curious, he searched for the file names on the internet and redownloaded them.  He opened them, realized what they contained, and left them on his hard drive.  Later, he backed them up.  In total, since he first downloaded the torrent files in 2017, Knott opened only 11 of the child-pornography images and videos that the files contained.

The default setting on the peer-to-peer file-sharing program that Knott used to download the child pornography is such that his computer was then enlisted in sharing the files.  He did not know of this setting and did not intend to share them.

II.

A.

The United States Probation Officer determined that Knott's sentencing range under the United States Sentencing Commission Guidelines Manual and applicable statutes is 78 to 97 months.

According to the Guidelines, Knott's base offense level is 18. *See* United States Sentencing Guidelines Manual (U.S.S.G.) § 2G2.2(a)(1) (U.S. Sent'g Comm'n 2021). He also qualifies for four special offense characteristics, leading to a 13-level increase as follows:

- Because some of the files on his computer portrayed prepubescent minors, he receives a two-level increase. *See id.* at § 2G2.2(b)(2).

- Because some of the files on his computer contained sadistic, masochistic, or violent images, he receives a four-level increase. *See id.* at § 2G2.2(b)(4).

- Because he used a computer to possess the pornography, he receives a two-level increase. *See id.* at § 2G2.2(b)(6).

- Because he possessed more than 600 images, he receives a five-level increase. *See id.* at § 2G2.2(b)(7)(D).

After a three-level downward adjustment for acceptance of responsibility, *see id.* at § 3E1.1(a) & (b), these enhancements result in a final offense level of 28. Because Knott has no criminal history, his criminal history category is I.  A criminal history category of I and a total offense level of 28 yields a sentence range of 78 to 97 months.  *See id.* at ch. 5, pt. A.

Neither party objected to this calculation, although, as noted above, Knott moved for a variance under the *Klear* framework and the government did not object to its application.  The court now turns to apply that framework.

### B.

In *Klear,* this court rejected the Guidelines framework for child pornography as unmoored from the current reality of file sharing and unreasonable under the factors laid out in 18 U.S.C. § 3553(a).  The court noted that, in 2012, the Sentencing Commission issued a report on non-production child-pornography offenses.  *See*

3 F. Supp. 3d at 1303 (citing *Special Report to Congress: Federal Child Pornography Offenses*, U.S. Sent'g Comm'n, (Dec. 2012)). In the report, the Commission argued that, because times have changed since the child-pornography guidelines were created--and, specifically, because the rise of the internet has transformed how child pornography is typically obtained--those guidelines are now anachronistic and do not adequately distinguish among offenders on the basis of the § 3553(a) factors.

In light of this report, and in an effort to better capture the § 3553(a) factors, the court created the following framework: (I) a base offense level of 18;[1] (II) up to nine additional levels for the content and size of the collection; (III) up to nine additional levels for engagement with other offenders; (IV) up to

_____

1. The base offense level in *Klear*, which involved a distribution offense, was 20. *See* 3 F. Supp. 3d at 1308. However, the court has since clarified that where the offense is mere possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B), as here, the base offense level shall be 18. *See United States v. Westbrook*, 2015 WL 470841, at *2 n.2 (M.D. Ala. Feb. 4, 2015) (Thompson, J.).

7

five additional levels for previous criminal sexual behavior with youth; and (V) two floater points if conduct in one category is particularly egregious. Factors (II) and (III) are further broken down into subcategories, as explained below.

Because of the intricate nature of the framework, the court provides the following breakdown of how each factor laid out in *Klear* applies to Knott:

(I)    *Base Offense Level:* 18

(II)   *Content of Knott's Collection and Nature of His Collecting Behavior:* +2

   (a) Representation of age of children indicative of intentional collection of child pornography.

       Possible Points: 3

       Actual Points: 2

       Reason: Knott's pornography collection contained enough images of child pornography such that the court found that there was a substantial probability that Knott collected child pornography intentionally. At the same time, his pornography collection consisted mostly of computer-generated images that the government does not allege to have constituted child pornography. *See* Government's Second Sentencing Memorandum (Doc. 62) at 5 (reporting that Knott's pornography collection included over 100,000 computer-generated images); *see also*

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 256 (2002) (invalidating under the First Amendment a provision of 18 U.S.C. § 2256 criminalizing the possession of sexually explicit images that appear to depict minors but were produced without using any real minors). Given the prevalence of these images, and Knott's professed interest in computer-generated pornography, *see* Psychological Evaluation of Dr. Babcock (Doc. 49) at 8, the court finds that, in comparison to other child-pornography cases, the evidence in this case that Knott collected child pornography intentionally is not so compelling as to warrant a three-point increase.

(b) Number of violent or sadomasochistic images of children.

Possible Points: 3

Actual Points: 0

Reason:   Knott's pornography collection contained at least some violent or sadomasochistic images of children, although the precise number is unspecified. While the court has previously found that a one-point increase is warranted under this factor where the defendant possesses a small number of such images, *see Westbrook*, 2015 WL 470841 at *2; *United States v. Piggott*, 2015 WL 1894319, at *3 (M.D. Ala. Apr. 27, 2015) (Thompson, J.), intervening factual developments have led it to reconsider the application of this factor.

Disturbingly, it now appears that the vast majority of files containing child pornography available for download on the internet include images of violent or sadomasochistic abuse. *See Federal Sentencing of Child Pornography Non-*

9

*Production Offenses*, U.S. Sent'g Comm'n, (June 2021) at 19 (reporting that, in 2019, federal courts applied the Guidelines enhancement for images depicting sadistic or masochistic conduct in 84 % of non-production cases and 78.6 % of possession cases); *Child Pornography*, U.S. Dep't Justice, https://www.justice.gov/criminal-ceos/child-pornography (last visited August 29, 2022) ("Unfortunately, emerging trends reveal an increase in the number of images depicting sadistic and violent child sexual abuse."). Given the near ubiquity of violent or sadomasochistic images of children among child-pornography files available for download on the internet, the court finds that the presence of a small number of such images in a pornography collection will generally not be sufficient on its own to indicate that the defendant intended to collect such images, or to distinguish the case from the mine-run of cases such that a sentencing enhancement is warranted. Because there is no evidence in this case to indicate that Knott intended to collect images of violent or sadomasochistic abuse, the court will assign no points under this factor.

(c) Depth of engagement in child pornography.

Possible Points: 3

Actual Points: 0

Reason:   Knott's engagement with child pornography was minimal.   Although his collection contained a large number of images, Knott downloaded files containing child pornography on only two occasions, on each of which he downloaded the same four files advertised as a single collection.   In total, he opened only 11 images and videos.   His collection

was not organized in any way, and the child
pornography that he downloaded was mixed
together with other images that were not child
pornography.

(III) *Engagement with Other Offenders:* +1

  (a) Impersonal distribution of child pornography
     (peer-to-peer).

     Possible Points: 3

     Actual Points: 1

     Reason:  Knott did not intend to share, and only
     did so because the default setting on the peer-
     to-peer file-sharing program that he used to
     download the child pornography was such that his
     computer was enlisted in sharing the files.
     Nevertheless, he did share.

  (b) Personal distribution of child pornography.

     Possible Points: 6

     Actual Points: 0

     Reason:  Knott did not personally distribute
     child pornography.

  (c) Participation in online communities devoted to
     child sexual exploitation.

     Possible Points: 9

     Actual Points: 0

     Reason: Knott did not participate in any online
     communities devoted to child sexual
     exploitation.

(IV)  *Previous Criminal Sexually Dangerous Behavior*:
+0

Possible Points: 5

Actual Points: 0

Reason:  Knott has no criminal history and no
history of sexually violent behavior.

(V)  *Adjustment for Multiple Factors:* +0

Possible Points: 2

Actual Points: 0

Reason:  Knott is not near the maximum in any
category.

Under this framework, then, Knott's base offense
level of 18 is subject to a total increase of three
levels, resulting in an adjusted offense level of 21.
Under the plea agreement, a three-level reduction applies
because Knott accepted responsibility for his crime.
This results in a final offense level of 18.  Because he
has no criminal history at all, his criminal history
category is I.  A criminal history category of I and an
offense level of 18 yield a sentence range of 27 to 33
months.  *See* U.S.S.G. ch. 5, pt. A.

12

III.

Having applied the *Klear* framework, the court next turns to Knott's motion for a variance on the basis of his ASD.[2]  The parties presented evidence and the court heard argument.  The evidence reflected that Knott's ASD contributed to his offense conduct and renders him exceptionally vulnerable to both decompensation and abuse in a prison setting, and that his risk of recidivism is exceedingly low.  Based on the evidence, the court determined that, despite the severity of Knott's crime, a variance was warranted.  It now elucidates its reasoning.

---

2. The *Klear* framework is a variance that recalibrates the heartland case for child pornography. That, however, does not end the inquiry.  As with any other sentencing, defendants may present evidence that their cases are outside the heartland of cases and warrant additional variances under § 3553(a).  *See Piggott*, 2015 WL 1894319 at *3.

**A.**

Prior to trial, Knott was evaluated by two psychologists, Dr. Robert A. Babcock, Ph.D., and Dr. Kale Kirkland, Ph.D., both of whom served as expert witnesses during the hearing on Knott's competency and motion for a variance, and both of whom diagnosed him as having severe depression and ASD without accompanying language or intellectual impairment. According to the Diagnostic and Statistical Manual of Mental Disorders:

> "Autism spectrum disorder is characterized by persistent deficits in social communication and social interaction across multiple contexts, including deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skills in developing, maintaining, and understanding relationships. In addition to the social communication deficits, the diagnosis of autism spectrum disorder requires the presence of restricted, repetitive patterns of behavior, interests, or activities....

> "Within the diagnosis of autism spectrum disorder, individual clinical characteristics are noted through the use of specifiers (with or without accompanying intellectual impairment; with or without accompanying structural language impairment; associated with a known medical or genetic condition or environmental factor; associated with another neurodevelopmental, mental, or behavioral disorder), as well as

14

specifiers that describe the autistic symptoms
(age at first concern; with or without loss of
established skills; severity). These specifiers
provide clinicians with an opportunity to
individualize the diagnosis and communicate a
richer clinical description of the affected
individuals. For example, many individuals
previously diagnosed with Asperger's disorder
would now receive a diagnosis of autism spectrum
disorder without language or intellectual
impairment."

Am. Psychiatric Ass'n, Diagnostic and Statistical Manual

of Mental Disorders 31-32 (5th ed. 2013).

Because Knott does not have accompanying language or

intellectual impairment, his disability is not always

readily apparent.  He has a high IQ, a good vocabulary,

and no visible physical disabilities.

Nevertheless, the experts agreed that Knott has

severe deficits in social and adaptive skills.  According

to Dr. Babcock, Knott scored in the third percentile

(that is, in the bottom three percent of all test-takers)

on the standard clinical test designed to measure "the

things that people do to function in their everyday

lives."  Psychological Report of Dr. Babcock (Doc. 49)

at 8.  Specifically, in the areas of "receptive

communication" and "interpersonal relationships," he functions at about the level of three-year-old; in the area of "coping skills," he functions at about the level of a four-year-old; and in the area of "expressive communication," he functions at about the level of a five-year-old. *Id.* at 8-9.

These deficits were apparent early in Knott's life. In an interview with Dr. Babcock, Knott's parents revealed that Knott, as a child, did not seem to "think, problem-solve, and understand basic concepts like average children"; did not make generalizations like average children; did not "move about the community as independently as other children of the same age"; and did not feed or groom himself appropriately for his age. *Id.* at 4-5. They described Knott as "not communicating, being very awkward in social situations, not 'reading the room,' getting locked into one idea," and being unable to "read parental facial expressions," and recounted that, in conversations with adults, "he would often abruptly stop interacting by making a face and become

'locked in,' sitting and not responding to anything [an] adult said for extended periods of time." *Id.* at 5. They also reported that Knott had, and continues to have, an extreme emotional attachment to certain objects. For instance, he still has socks from his childhood, as well as old dishes that the family no longer uses, which he cannot discard. *See id.*

Unfortunately, however, Knott was not diagnosed as having ASD until 2020. *See id.* at 2-3. Only in the last two years has he has begun to receive appropriate treatment.


B.

The evidence indicates that Knott's ASD contributed to his offense conduct. As Dr. Kirkland put it, "Knott's involvement with child pornography is considered to have been strongly influenced by the presence of ASD," and particularly his "impaired social and emotional development." Psychological Report of Dr. Kirkland (Doc. 40-1) at 4.

17

According to the expert testimony, people with ASD often lack the ability to make the inferences that allow neurotypical people to understand, without being told, that child pornography is harmful to children and socially unacceptable.  These include inferences that, to neurotypical people, may seem obvious; for instance, some people with ASD are unable to intuit that objects and people depicted in photographs exist (or once existed) in real life.[3]  People with ASD also often lack the ability to 'take' the perspectives of others and are severely limited in their ability to read facial

---

3. To illustrate this phenomenon to the court, Dr. Babcock recounted the following incident involving a psychiatrist colleague of his who had been hired to evaluate a defendant in an unrelated child-pornography case: "During discussion of his actions, the patient expressed his incredulity that anyone would object to his viewing child pornography on his computer.  He said, 'But they're only pictures!!' At that point in the interview, the clinician explained in a concrete and step-by-step manner that the pictures could only have been made by forcing a real child into an abusive and harmful situation.  As this fact, so obvious to any ordinary person, dawned on him, the patient became genuinely remorseful."  Psychological Report of Dr. Babcock (Doc. 49) at 22.

expressions, both of which deficits may make it difficult for them to consider, "without direct explanation, how an actual child would experience being forced to participate in the creation of the material being viewed." Psychological Report of Dr. Babcock (Doc. 49) at 22. For this reason, according to Dr. Babcock, it is extremely important that people with ASD receive instruction on how to safely navigate the internet and why child pornography is harmful to children.

Knott is no exception. According to Dr. Babcock, "in the areas of functioning which are most relevant to understanding whether he was understanding that actual children were being abused (receptive communication and interpersonal relationships), [he] demonstrates the level of skills we would expect in someone who is 2 years, 10 months and 3 years of age, respectively." *Id.* at 23. As a result, and because he had not been diagnosed with ASD and therefore had not received appropriate instruction on safe internet use, Knott was unable at the time of his crime to understand that actual children were

exploited in the process of producing the child pornography he possessed. Summarizing the results of his evaluation of Knott, Dr. Babcock reported that: "[B]ecause [Knott] was looking at the adult and child pornography as being on the screen, he was not thinking of it as a real thing. He described it as being just role playing. He explained that he didn't think about the implications for the actors (either adults or children) of participating in making the pornography." *Id.* at 8.

Dr. Babcock also explained that when he asked Knott about the concept of consent in pornography, Knott replied that, because pornography is staged, he had never thought about the concept of consent in the context of pornography before, *see id.*, and that, after Dr. Babcock explained to Knott how the child pornography was produced--that is, that its production involved real children having actual sex--Knott became visibly

distraught and exclaimed that he was repulsed by the idea that children "were actually being sexual," *id.* at 23.[4]

### C.

The evidence also establishes that Knott's ASD would make the prison environment exceptionally difficult for him.

Because of his ASD, Knott is, as both experts explained, exceptionally vulnerable to emotional and physical abuse.  Dr. Kirkland found that Knott's ASD, which renders him "docile, passive-dependent, submissive, and unable to even be appropriately assertive," puts him at "high risk to be taken advantage of and/or physically/sexually abused in a correctional setting."  Psychological Evaluation of Dr. Kirkland (Doc. 40-1) at 2, 4.  Dr. Babcock was in full agreement with

---

4. According to Dr. Babcock, Knott's inability to comprehend that the videos he possessed depicted real sexual conduct by children was likely exacerbated by his prior exposure to cartoon pornography, which may have cemented in his mind the idea that the pornography he possessed had no connection to reality.

that assessment.  As he put it, "I would not put [Knott] in any place that would not be safe for a three-year-old to function."  June 8, 2022, Rough Draft Sent'g Tr. at 54.

Dr. Babcock also testified that Knott's ASD would make it highly difficult for him to understand rules and codes of conduct--especially unwritten ones--in the prison setting.  Based on his evaluation, he found that Knott is "going to miss an awful lot of the information that anybody who is neurotypical would get," is "extremely handicapped," and will miss tone, facial expression, context, and "even an understanding of perspective and where the other person might be coming from." *Id.*  Because he is unable to read social cues, Dr. Babcock explained, Knott may inadvertently fail to understand directions from guards or signals from other prisoners, thus impeding his ability to avoid disciplinary sanctions and interpersonal conflict.

Moreover, even if Knott were able to understand rules and codes of conduct in the prison setting, the evidence

indicated that his ASD would make it difficult for him to comport his behavior with those norms.  According to Dr. Babcock, Knott's ASD diminishes the extent to which he is able to "self-monitor" his behavior.  Dr. Babcock likened this phenomenon to the experience of drivers attempting to obey the speed limit without working speedometers: while the drivers may understand that the law forbids them from traveling above a certain speed, they cannot stay under that speed limit because they have no idea how fast they are going.  *See id.* at 83-84.  So too with Knott.  Even when he does understand rules and social codes, his ability to gauge his own compliance with them is diminished such that, without training and practice, he may unwittingly break them.

Further, in light of these factors--Knott's vulnerability to physical and sexual violence, his inability to read social cues, and his lack of self-monitoring skills--Dr. Kirkland found that, without sufficient care, it is "highly likely that he will be at-risk for deterioration in a correctional setting."

Psychological Evaluation of Dr. Kirkland (Doc. 40-1) at 2.  When asked to elaborate, Dr. Kirkland explained that Knott's risk of self-harm is likely to increase in the prison environment, such that he may attempt to kill himself, and that he will likely withdraw from others and attempt to isolate himself in his cell.  *See* June 8, 2022, Rough Draft Sent'g Tr. at 13-14.

The experts agreed that Knott is unlikely to receive the care necessary to prevent decompensation in prison. According to Dr. Kirkland, "[d]etention would disrupt his treatment and cause significant issues to his mental state," Psychological Evaluation of Dr. Kirkland (Doc. 40-1) at 4, and, even if he were to receive therapy and psychiatric care, "there are still other variables that exist regarding his susceptibility to being taken advantage of and abused," June 8, 2022, Rough Draft Sent'g Tr. at 14.  Dr. Babcock concurred, explaining that Knott would require regular individual therapy to avoid decompensation and that group therapy would not be effective for him because "he doesn't have the skills to

**24**

effectively assert himself and participating would be incredibly intimidating." *Id.* at 85.  Dr. Babcock also explained that according to his review of the Bureau of Prisons' sex-offender treatment programs, such programs are "not designed for people that are on the [autism] spectrum and [are] very unlikely to be effective for [Knott]." *Id.* at 71.


D.

Finally, the evidence indicated that Knott, unlike other possessors of child pornography, is not attracted to children and that he poses virtually no risk of physically harming any adult or child.  *See* Psychological Evaluation of Dr. Kirkland (Doc. 40-1) at 3-4; Psychological Evaluation of Dr. Babcock (Doc. 49) at 23; June 8, 2022, Rough Draft Sent'g Tr. at 24.[5]  Moreover,

---

5. That Knott is not sexually attracted to children raises the question of why he downloaded child pornography in the first place.  Dr. Babcock's evaluation indicates that the answer to this question has to do with Knott's interest in cartoon pornography, which commonly features child-like characters and is often available for

since committing the crime, Knott has received
instruction regarding the harms caused by child
pornography. He is deeply remorseful--indeed, Dr.
Babcock testified that his depression has been compounded
to a worrying degree by his recognition of the
wrongfulness of his actions--and poses a very low risk
of reoffending, *see* Psychological Evaluation of Dr.
Kirkland (Doc. 40-1) at 4.


                              E.

     In light of the above evidence, and after considering
the factors set forth in 18 U.S.C. § 3353(a), the court
determines that a downward variance is warranted for two
reasons.

---

download together with actual child pornography.
Apparently, Knott discovered child pornography by
downloading files that contained both cartoon pornography
and child pornography. *See* Psychological Evaluation of
Dr. Babcock (Doc. 49) at 8.

                             26

First, Knott's ASD diminished his moral culpability.[6]
"[I]n meting out appropriate punishment, the court should
make a good-faith attempt to ensure that the defendant
is not inappropriately punished for having a disease,"
disorder, or disability. *United States v. Mosley*, 277
F. Supp. 3d 1294, 1296 (M.D. Ala. 2017) (Thompson, J.).
Thus, the court has granted variances to defendants whose
offense conduct was driven by drug addiction, *see United
States v. Mosley*, 312 F. Supp. 3d 1289, 1292-95 (M.D.
Ala. 2018) (Thompson, J.), the lingering effects of
childhood trauma, *see United States v. Carter*, 506 F.
Supp. 3d 1204, 1210-14 (M.D. Ala. 2020) (Thompson, J.),
and post-traumatic stress disorder incurred in the
workplace, *see United States v. Oliver*, 2022 WL 2188967,
at *4 (M.D. Ala. June 17, 2022) (Thompson, J.).  In this
case, as explained above, the evidence is clear that

---

6. While a *departure* based on diminished capacity is
forbidden under U.S.S.G. § 5K2.13 for crimes involving
child pornography, the Guidelines do not prevent the
court from granting a *variance* on that basis.

Knott's conduct was strongly influenced by his ASD. Indeed, Knott's visceral distress upon learning that the production of the child pornography he possessed involved real children engaging in real sexual acts, and his lack of sexual attraction to children, indicate that if not for his ASD he would have tried to avoid downloading child pornography. To be clear, this is not to say that, simply because Knott has ASD, he was more likely to download child pornography or that people with ASD are more likely to seek out child pornography in the first place. The court has not seen any evidence supporting such ideas. Instead, the particular evidence presented in this case shows that, because of the way ASD specifically impacts Knott, he did not have a neurologically unimpaired person's ability to understand the horrible reality behind the child pornography he encountered.

Second, Knott's ASD renders him extraordinarily vulnerable to abuse in prison. The Supreme Court has spoken approvingly of downward 'departures' under

U.S.S.G. § 5H1.4--which provides that "an extraordinary physical impairment may be a reason to depart downward"--in cases where a defendant's physical condition renders him especially susceptible to victimization in prison, *see Koon v. United States*, 518 U.S. 81, 107 (1996); *see also id.* at 111-12 (allowing departure where defendants' notoriety and status as police officers rendered them unusually susceptible to abuse in prison), and this court has previously granted a downward departure on that basis, *see United States v. Ruff*, 998 F. Supp. 1351, 1359-60 (M.D. Ala. 1998) (Thompson, J.).[7] *See also United States v. Lara*, 905 F.2d 599, 603 (2d Cir. 1990) (allowing a departure under U.S.S.G. § 5H1.4 and U.S.S.G. § 5K2.0(a)(2)(B)--the

---

7. These cases were decided under a previous version of § 5H1.4 that characterized physical condition or appearance as a "discouraged factor" on which to base a departure. *See* 1995 U.S.S.G. App. C, amend. 386 (effective Nov. 1, 1991). The Commission has since amended the guideline so that physical condition or appearance is no longer a discouraged factor. *See* 2010 U.S.S.G. App. C, amend. 739 (effective date Nov. 1, 2010).

29

Guidelines subsection authorizing departures based on "a circumstance that the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence"--where the defendant's "immature appearance, sexual orientation and fragility" rendered him especially vulnerable to abuse in prison); *United States v. Long*, 977 F.2d 1264, 1278 (8th Cir. 1992) (allowing a departure under § 5H1.4 where the defendant's frail health left him "exceedingly vulnerable to possible victimization and resultant severe and possibly fatal injuries"); *United States v. Spring*, 108 Fed. App'x 116, 125 (4th Cir. 2004) (allowing a departure under § 5H1.4 on the basis of the defendant's "extreme vulnerability to prison abuse").[8]   Although

_____

8. *See also United States v. Maddox*, 48 F.3d 791, 798 (4th Cir. 1995) (confirming that a district court may consider a defendant's exceptional vulnerability to abuse in prison as grounds for a departure, and vacating a sentence because evidence did not support departure on that basis); *United States v. Graham*, 83 F.3d 1466, 1481 (D.C. Cir. 1996) (holding that "extreme vulnerability to assault in prison may be a ground for departure," if the "defendant's vulnerability [is] so extreme as to substantially affect the severity of confinement");

Knott moved for a variance, rather than a departure, the court "has often looked to the Commission's policy statements concerning departures when considering whether a variance is appropriate," *United States v. Gooch*, 2022 WL 1747334, *1 (M.D. Ala. May 31, 2022) (Thompson, J.), and here it finds that a downward variance is warranted under the factors set forth in

---

*United States v. Belt*, 89 F.3d 710, 714 (10th Cir. 1996) (confirming that a district court may consider a defendant's exceptional vulnerability to abuse in prison as grounds for a departure); *United States v. Wilke*, 156 F.3d 749, 754 (7th Cir. 1998) (confirming that a district court may consider a defendant's exceptional vulnerability to prison abuse as grounds for a § 5H1.4 departure, and vacating a sentence because the district court did not make findings to adequately support a departure on that basis); *United States v. Winters*, 174 F.3d 478, 485 (5th Cir. 1999) (confirming that a district court may consider a defendant's exceptional vulnerability to abuse in prison as grounds for a departure, and vacating a sentence because the district court did not make findings to adequately support departure on that basis); *United States v. Parish*, 308 F.3d 1025, 1032-33 (9th Cir. 2002) (allowing a departure under § 5K2.0 where the defendant's "stature, demeanor, and naivete ... suggest[ed] heightened susceptibility to abuse in prison"); *United States v. LaVallee*, 439 F.3d 670, 707-08 (10th Cir. 2006) (allowing a departure under § 5K2.0 where the defendants were especially susceptible to abuse in prison).

§ 5H1.4.   Knott's ASD is undisputedly a physical condition--as Dr. Babcock testified, it is caused by structural abnormalities in the brain--that distinguishes his case by substantially increasing the risk that he will be sexually or otherwise physically assaulted in prison.  In light of that risk, the court finds that to incarcerate him would not only undermine the Sentencing Guideline's objective of uniformity in sentencing, "but, depending on the magnitude of indifference of prison officials to his risk for assault, could also violate the Eighth Amendment."  *Ruff*, 998 F. Supp. at 1359; *see id.* ("[G]ratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, ... any more than it squares with evolving standards of decency .... Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." (quoting *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) (internal quotation marks omitted))).

These abuse-related considerations are further buttressed by the fact that Knott, given the specific circumstances of his ASD, is vulnerable to decompensation if held in a prison setting. In particular, the court finds credible the expert testimony that Knott is likely to decompensate--and to experience mental deterioration--if he is not able to receive the same frequency and quality of mental-health treatment that he has received in the community. *See* Rough Draft Sent'g Tr. at 13-14 (testimony of Dr. Kirkland).

In determining whether to grant a variance, the court also considered, as in all cases, the need to deter criminal conduct and promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(B) & (C). Knott's crime was very serious. By downloading child pornography, he contributed to the demand for its production, which causes grave "physiological, emotional, and mental" injuries to the children involved. *New York v. Ferber*, 458 U.S. 747, 758 (1982). By inadvertently sharing it, he ensured the truth of what the victims of child

33

pornography must "go through life knowing," *id.* at 759 n.10 (quoting David P. Shouvlin, *Preventing the Sexual Exploitation of Children: A Model Act*, 17 Wake Forest L. Rev. 535, 545 (1981)), namely, that a "permanent record of [their] abuse," *Ashcroft*, 535 U.S. at 249, is "circulating within [a] mass distribution system," *Ferber*, 458 U.S. at 759 n.10 (quoting Shouvlin, *Preventing the Sexual Exploitation of Children*). He deserves to be punished.

Given the facts of this case, however, the court has determined that a sentence of incarceration is not necessary to accomplish these goals. With respect to specific deterrence, the evidence indicates that Knott's risk of reoffending is low--and that it will be lowered further by individualized counseling from a therapist trained to treat patients with ASD, which Knott is unlikely to receive in prison. *See* 18 U.S.C. § 3553(a)(D) ("The court, in determining the particular sentence to be imposed, shall consider ... the need for the sentence imposed ... to provide the defendant with

**34**

needed ... medical care, or other correctional treatment in the most effective manner.").

With respect to general deterrence, the court emphasizes that it has granted a variance based on particularized findings as to Knott's deficits and the effect that those deficits have on his behavior and his vulnerability to abuse. To the extent that other defendants do not share Knott's specific deficits or cannot present evidence of the effect of such deficits on their behavior or vulnerability, they cannot expect to receive a similar sentence.[9] This is true even of other defendants with ASD; as the experts testified, ASD manifests in myriad ways and the court does not mean to suggest that all people with ASD are unable to understand without being told that child pornography is harmful to

---

9. The court has previously sentenced other defendants who possessed child pornography to terms of incarceration, including defendants with borderline intellectual functioning. *See Piggott*, 2015 WL 1894319 at *3.

children, nor that all people with ASD are so vulnerable
to abuse in prison as to warrant a variance on that basis.

Knott is also not escaping punishment.  He shall be
required to serve 27 months of home detention as one of
the conditions of his seven years of supervised release.
These 27 months align with the 27-month benchmark
suggested by the Guidelines as modified by *Klear*.  In
addition, he shall pay $ 3,000 in restitution under 18
U.S.C. § 2259 to each of the five victims who has sought
it.  And he will live for the rest of his life as a
registered sex offender, with severe restrictions on his
residence, movements, activities, and associations.
Already, his parents have been forced to begin searching
for a new home, for theirs is not compliant with Alabama's
Sex Offender Registration Act.[10]  *See* June 8, 2022, Rough
Draft Sent'g Tr. at 129.

---

11. The court notes that it is not the first court
to grant a variance in a case concerning possession of
child pornography on the bases articulated above.  In
*United States v. Huseth*, Chief Judge Julie Robinson
considered a defendant, similar to Knott, who pleaded
guilty to possession of child pornography that included

IV.

Aside from 27 months of home detention, Knott will be subject to other conditions of supervised release. Dr. Babcock made several recommendations for Knott's treatment--including that he receive psychiatric counseling, additional sex education, additional

---

images of prepubescent children engaged in sadomasochistic conduct. *See* 2021 WL 4940915 at *4 (D. Kan. Oct. 22, 2021) (Robinson, C.J.). Also like Knott, that defendant was diagnosed with ASD, although certain indicia suggest differences in their functioning. *Compare id.* at *6 ("Huseth is severely impaired and, in many areas, functions at the level of an 8-year-old.") *with* Psychological Report of Dr. Babcock (Doc. 49) at 9, 23 (noting that Knott functions in various areas at levels comparable to someone between two and five years of age).

The evidence established that Huseth's ASD prevented him from understanding that "every child depicted in child pornography has been raped, abused, and irreparably harmed" and rendered him "particularly vulnerable to bullying and worse injury in a prison environment." 2021 WL 4940915 at *2, *10. For both of these reasons, Chief Judge Robinson found, in an exceptionally detailed and well reasoned opinion, that although the defendant's Guidelines sentence was 78 to 97 months, "a downward variance to a sentence of probation [was] warranted." *Id.* at *17.

training in safe internet use, training to improve his perspective-taking skills, and therapy to address his depression--and he shall be required to comply with all of these recommendations while on supervised release.

In the almost two years that have passed since he was diagnosed with ASD, Knott has begun to make progress in therapy.  His need for such treatment is urgent as his depression has worsened dramatically since he has come to understand the impact of his crime.  As defense counsel described during an on-the-record status conference, Knott becomes so distressed when speaking about his crime that he scratches at his face uncontrollably and, as Knott explained to Dr. Babcock, "he cannot remember what it feels like to feel happy with himself."  Psychological Evaluation of Dr. Babcock (Doc. 49) at 8.

***

Accordingly, it is ORDERED that defendant Jonathan Dale Knott's motion for a variance (Doc. 64) is granted.

DONE, this the 1st day of November, 2022.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE

38